UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| HAZEL K., on behalf of deceased claimant KERRY K., <br><br> Plaintiff, <br><br> v. <br><br> LELAND DUDEK, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION DENYING DISABILITY BENEFITS** <br><br> Case No. 1:23-cv-00118 <br><br> Magistrate Judge Daphne A. Oberg |

Plaintiff Hazel K., on behalf of deceased claimant Kerry K.,[1] brought this action for judicial review of the denial of Mr. K.'s application for disability insurance benefits by the Commissioner of the Social Security Administration.[2]  The Administrative Law Judge ("ALJ") who addressed Mr. K.'s application determined he did not qualify as disabled.[3] Ms. K. argues the ALJ erred by (1) finding Mr. K.'s post-traumatic stress disorder ("PTSD") to be a nonsevere impairment, and (2) failing to acknowledge the severity of Mr. K.'s migraines in assessing Mr. K.'s residual functional capacity.[4]  As explained below, any error in finding Mr. K.'s PTSD nonsevere was harmless.  Further, the ALJ applied the correct legal standards in assessing Mr. K.'s residual functional capacity,

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in judicial opinions in certain cases, including social security cases, the plaintiff and the deceased claimant are referred to by first name and last initial only.

[2] (*See* Compl., Doc. No. 1.)

[3] (Certified Tr. of Admin. R. ("Tr.") 15–34, Doc. No. 9.)

[4] (*See* Opening Br. 2, 7–8, Doc. No. 11.)

and substantial evidence supports his findings regarding Mr. K.'s migraines.  The Commissioner's decision is affirmed.[5]

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code provides for judicial review of the Commissioner's final decision.  This court reviews the ALJ's decision to determine whether substantial evidence supports his factual findings and whether he applied the correct legal standards.[6]  "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."[7]

An ALJ's factual findings are "conclusive if supported by substantial evidence."[8] Although the threshold for substantial evidence is "not high," it is "more than a mere scintilla."[9]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's

---

[5] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. No. 8.)

[6] *See* 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[7] *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

[8] *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotation marks omitted).

[9] *Id.* at 103 (citation omitted).

[10] *Id.* (citation omitted).

findings from being supported by substantial evidence."[11]  And the court may not reweigh the evidence or substitute its judgment for that of the ALJ.[12]

## APPLICABLE LAW

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or last for at least twelve consecutive months.[13] An individual is considered disabled only if his impairments are so severe, he cannot perform his past work or "any other kind of substantial gainful work."[14]

In determining whether a claimant qualifies as disabled, the ALJ uses a five-step sequential evaluation, considering whether:

1) the claimant is engaged in substantial gainful activity;

2) he has a severe medically determinable physical or mental impairment;

3) the impairment is equivalent to an impairment precluding substantial gainful activity (listed in the appendix of the relevant disability regulation);

4) he has the residual functional capacity to perform past relevant work; and

5) he has the residual functional capacity to perform other work, considering his age, education, and work experience.[15]

---

[11] *Lax*, 489 F.3d at 1084 (citation omitted).

[12] *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

[13] 42 U.S.C. § 423(d)(1)(A).

[14] *Id.* § 423(d)(2)(A).

[15] *See* 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988).

In the first four steps, the claimant has the burden of establishing disability.[16]  At step five, the Commissioner must show the claimant retains the ability to perform other work in the national economy.[17]

## PROCEDURAL HISTORY

Mr. K. applied for disability insurance benefits under Title II of the Social Security Act,[18] alleging he became disabled on June 30, 2019.[19]  Because Mr. K. died while his application was pending,[20] his mother, Hazel K., was substituted as the party entitled to pursue his application for benefits.[21]  After holding an administrative hearing,[22] the ALJ issued a decision denying benefits.[23]

At step two of the sequential evaluation, the ALJ found Mr. K. had the following severe impairments: left shoulder osteoarthritis, status post acromioplasty and labral repair; bilateral sensorineural hearing loss; asthma; obstructive sleep apnea; deep vein thrombosis on chronic anticoagulation therapy; migraines; and obesity.[24]  The ALJ also

---

[16] *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).

[17] *Id.*

[18] 42 U.S.C. §§ 401–434.

[19] (*See* Tr. 15.)

[20] (*See id.*)  Mr. K. died from hypertensive cardiovascular disease.  (*See* Tr. 1890; Opening Br. 5, Doc. No. 11.)  This condition was not a basis for his disability claim. (*See* Tr. 78–79; Answer Br. 6, Doc. No. 17.)

[21] (*See* Tr. 15.)

[22] (*See* Tr. 41–62.)

[23] (Tr. 15–34.)

[24] (Tr. 18.)

found Mr. K. had nonsevere impairments, including PTSD, depression, and anxiety.[25]

At step three, the ALJ found these impairments did not meet or medically equal an

impairment listing.[26]

The ALJ then found Mr. K. had the residual functional capacity to perform "light

work" with certain restrictions:

> [H]e could never climb ladders, ropes, and scaffolds; he could frequently
> reach with the nondominant left upper extremity; he could not have
> concentrated exposure to pulmonary irritants and extreme heat; he could
> not have any exposure to hazards; he must have avoided work
> environments with greater than a moderate level of noise[;] . . . [and] he
> must have had the ability to wear tinted lenses indoors or outdoors, or
> otherwise control the brightness of light in the work environment.[27]

The ALJ determined Mr. K. had no past relevant work at step four.[28]  But at step five,

based on this residual functional capacity and the testimony of a vocational expert, the

ALJ found Mr. K. capable of other work.[29]  Accordingly, the ALJ concluded Mr. K. was

not disabled and denied his claim.[30]  This decision became final when the Appeals

Council denied Ms. K.'s request for review.[31]

---

[25] (Tr. 19.)

[26] (Tr. 23–24.)

[27] (Tr. 24.)

[28] (Tr. 32.)

[29] (Tr. 33–34.)

[30] (Tr. 34.)

[31] (Tr. 1–3.)

# ANALYSIS

Ms. K. argues the ALJ erred by finding Mr. K.'s PTSD to be a nonsevere impairment, and by failing to include appropriate limitations related Mr. K.'s migraines in the residual functional capacity assessment.[32]  As explained below, any error in finding Mr. K.'s PTSD nonsevere was harmless, and Ms. K. has demonstrated no error in the ALJ's findings regarding Mr. K.'s PTSD and migraines.

A.  PTSD

Ms. K. first argues the ALJ erred by finding Mr. K.'s PTSD to be a nonsevere impairment at step two.[33]  Ms. K. contends any error at this step is not harmless because "the ALJ [did] not make any further evaluation of Mr. [K.'s] PTSD" and included no related limitations in the residual functional capacity.[34]

An ALJ's "failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe."[35]  This is because "[a]s long as the ALJ finds one severe impairment, the ALJ may not deny benefits at step two but must proceed to the next step."[36]  And after step two, the ALJ must consider the limiting effects of both severe and nonsevere impairments.[37]  In other

---

[32] (*See* Opening Br. 2, 7–8, Doc. No. 11.)

[33] (*See id.* at 8–12.)

[34] (Pl.'s Reply Br. ("Reply") 2, Doc. No. 19.)

[35] *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016).

[36] *Id.*; *see also* 20 C.F.R. § 404.1520(a)(4).

[37] *Allman*, 813 F.3d at 1330; *see also* 20 C.F.R. § 404.1545(a)(2) (providing all medically determinable impairments, including nonsevere impairments, are considered when assessing residual functional capacity).

words, as long as the ALJ proceeds beyond step two and considers all impairments in later steps, the failure to find a particular impairment severe is harmless.

Here, although the ALJ found Mr. K.'s PTSD nonsevere, he determined Mr. K. had other severe impairments at step two and proceeded through the remaining steps of the analysis.[38]  Contrary to Ms. K.'s argument, the ALJ expressly considered Mr. K.'s PTSD in assessing his residual functional capacity at later steps.  The ALJ stated: "In order to determine the claimant's residual functional capacity, I have considered the functional limitations resulting from all of the claimant's medically determinable impairments, including those deemed nonsevere."[39]  And the ALJ specifically identified and considered PTSD (along with depression and anxiety) as a nonsevere, medically determinable mental impairment.[40]  Ultimately, the ALJ found "no persuasive evidence the claimant's mental health impairments caused more than minimal limitations in the ability to perform basic work activities."[41]  And he concluded "the medical evidence [did] not support finding any mental functional limitations in the residual functional capacity."[42]  Because the ALJ proceeded beyond step two of the evaluation and considered Mr. K.'s PTSD in later steps, any error in finding PTSD nonsevere was harmless.

---

[38] (*See* Tr. 18–34.)

[39] (Tr. 19; *see also* Tr. 22 (stating "any [] effect that the claimant's nonsevere impairments had on his ability to function were considered when formulating the residual functional capacity").)

[40] (Tr. 19.)

[41] (Tr. 22.)

[42] (*Id.*)

Ms. K. does not expressly challenge the ALJ's finding that Mr. K.'s PTSD resulted in no limitations in his residual functional capacity.  (Instead, she focuses on the ALJ's finding of nonseverity at step two.)  Nevertheless, this finding is supported by substantial evidence.  As the ALJ explained, the mental residual functional capacity assessment reflected the degree of limitation ("or lack thereof") he found in the "paragraph B" mental function analysis at step two.[43]  In that analysis, the ALJ found Mr. K. had no more than "mild" limitations in the four areas of mental functioning known as the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.[44]  Ms. K. only specifically addresses the second area in her briefing: she argues the ALJ ignored evidence demonstrating Mr. K.'s inability to interact with others.[45]  Accordingly, only this area is addressed here.

The ALJ's finding that Mr. K. had only mild limitations in his ability to interact with others (and no work-related functional limitations) is supported by substantial evidence. The ALJ acknowledged Mr. K.'s reported difficulties getting along with family, friends, and neighbors—citing a function report Mr. K. completed in April 2020.[46]  But as the ALJ noted, Mr. K. also reported an ability to get along with authority figures such as police officers, bosses, landlords, and teachers.[47]  And Mr. K. noted he had never lost

---

[43] (*Id.*)

[44] (Tr. 20–21.)

[45] (*See* Opening Br. 11–12, Doc. No. 11.)

[46] (Tr. 20 (citing Tr. 364–66).)

[47] (*Id.* (citing Tr. 364–66).)

employment because of problems getting along with other people.[48]  The ALJ also relied on a function report by Ms. K. indicating Mr. K. was able to spend time with family and friends in person.[49]  And the ALJ noted Mr. K. was described as calm and cooperative during medical exams.[50]  Overall, the ALJ found "insufficient evidence to establish that the claimant's ability to relate to and work with supervisors, co-workers, or the public independently, appropriately, effectively, and on a sustained basis was more limited."[51]  The evidence the ALJ cited is adequate to support his conclusion that Mr. K. had only mild limitations in his ability to interact with others, and had no work-related functional limitations.  Accordingly, substantial evidence supports the ALJ's mental residual functional capacity assessment.

Ms. K. argues the ALJ ignored other evidence suggesting Mr. K.'s PTSD caused greater limitations, including medical records of PTSD treatment; Mr. K.'s reports to medical providers regarding flashbacks, anger, suicidal thoughts, and difficulty with people and crowds; and Mr. K.'s niece's testimony that Mr. K. was always on edge (especially in crowds), was always looking for weapons and exits, isolated in his room, and once pulled a gun on her children when they ran into his room.[52]  But the ALJ need not *discuss* every piece of evidence, so long as the record shows he *considered* all the

---

[48] (*Id.* (citing Tr. 364–66).)

[49] (*Id.* (citing Tr. 372).)

[50] (*Id.* (citing Tr. 1849, 1877).)

[51] (*Id.*)

[52] (*See* Opening Br. 10–12, Doc. No. 11.)

evidence.[53]  Here, the ALJ considered Mr. K.'s PTSD treatment records, his self-reported difficulties interacting with others, and his niece's testimony regarding the effects of his PTSD.[54]  In these circumstances, the existence of evidence supporting a different conclusion is insufficient to show the ALJ erred.  The court will not reweigh the evidence where, as here, substantial evidence supports the ALJ's findings.[55]

In sum, any error in finding Mr. K.'s PTSD nonsevere is harmless, where the ALJ proceeded through the analytical steps and considered the effects of Mr. K.'s PTSD on his residual functional capacity.  Further, substantial evidence supports the ALJ's finding that Mr. K.'s PTSD caused no residual functional capacity limitations.

B.  Migraines

Ms. K. next argues the ALJ erred by failing to include appropriate limitations related to Mr. K.'s migraines in the residual functional capacity assessment.[56]

---

[53] See Clifton v. Chater, 79 F.3d 1007, 1009–10 (10th Cir. 1996) ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.").

[54] (See Tr. 19 (discussing treatment records for PTSD and other mental health conditions); Tr. 20 (acknowledging Mr. K.'s self-reported difficulties getting along with others); Tr. 25 (summarizing Mr. K.'s niece's testimony regarding his PTSD, including that Mr. K. "had a gun with him at all times and all places," "was always on edge and nervous," "did not like going out or being around people," "was afraid of hurting people," and "increasingly became isolated").)

[55] See Langley, 373 F.3d at 1118.

[56] (Opening Br. 12–15, Doc. No. 11.)

1.  *Legal Standards*

A claimant's residual functional capacity reflects the most he can do in a work setting considering his limitations.[57]  In assessing residual functional capacity, the ALJ considers "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."[58]  The ALJ considers all relevant evidence in the record.[59]

An ALJ must evaluate a claimant's self-reported symptoms using a two-step process.  First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."[60]  Second, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."[61]  In doing so, the ALJ "examine[s] the entire case record."[62]  The ALJ considers factors such as: the claimant's daily activities; the duration, frequency, and intensity of symptoms; medication taken and whether it alleviates the symptoms; and other treatment or

---

[57] *See* 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *1–2 (July 2, 1996).

[58] SSR 96-8p, 1996 SSR LEXIS 5, at *5.

[59] *See* 20 C.F.R. § 404.1545(a)(3).

[60] SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016); *see also* 20 C.F.R. § 404.1529(b).

[61] SSR 16-3p, 2016 SSR LEXIS 4, at *4; *see also* 20 C.F.R. § 404.1529(c).

[62] SSR 16-3p, 2016 SSR LEXIS 4, at *9–10; *see also* 20 C.F.R. § 404.1529(c).

measures used to relieve the symptoms.[63]  The ALJ also considers any inconsistences between the claimant's statements and the rest of the evidence, including the claimant's history, medical signs and laboratory findings, and statements by medical sources and others.[64]

Social Security Ruling 19-4p provides direction to ALJs in evaluating headaches, including migraines.[65]  SSR 19-4p notes that although headaches are not a listed impairment, the most closely analogous listed impairment is epilepsy (Listing 11.02)—specifically, paragraph B or D of Listing 11.02.[66]  To meet the requirements of Paragraph B, a claimant must have seizures at least once a week for at least three consecutive months despite adherence to prescribed treatment.[67]  Under Paragraph D, a claimant must have seizures at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment, as well as a marked limitation in at least one area of functioning.[68]  In evaluating whether a claimant's headache disorder medically equals paragraph B or D of Listing 11.02, an ALJ should consider the following evidence:

> a detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying

---

[63] SSR 16-3p, 2016 SSR LEXIS 4, at *18–19; *see also* 20 C.F.R. § 404.1529(c)(3).

[64] 20 C.F.R. § 404.1529(c)(4).

[65] SSR 19-4p, 2019 SSR LEXIS 6 (Aug. 26, 2019).

[66] *Id.* at *16.

[67] *See id.* at *16–17; 20 C.F.R. pt. 404, subpt. P, App. 1, § 11.02(B).

[68] *See* SSR 19-4p, 2019 SSR LEXIS 6, at *17–18; 20 C.F.R. pt. 404, subpt. P, App. 1, § 11.02(D).

symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).[69]

### 2.  ALJ Findings

The ALJ found Mr. K.'s migraines to be a severe impairment not medically equal to Listing 11.02.[70]  As relevant here, the ALJ found "[t]he record failed to demonstrate a documented typical migraine pattern occurring more frequently than once a month, in spite of at least three months of prescribed treatment as required by 11.02A and 11.02B."[71]  The ALJ also found Mr. K.'s migraines "did not occur more frequently than once every 2 months for at least 4 consecutive months despite adherence to prescribed treatment as required by 11.02C and 11.02D with a marked limitation in" at least one area of functioning.[72]

The ALJ then followed the two-step process described above in evaluating Mr. K.'s reported symptoms related to migraines, for purposes of assessing his residual functional capacity.  Because Mr. K. died before the hearing, his niece testified about

---

[69] SSR 19-4p, 2019 SSR LEXIS 6, at *17.

[70] (Tr. 18, 24.)

[71] (Tr. 24.)

[72] (*Id.*)

his symptoms on his behalf.[73]   The ALJ summarized Mr. K.'s niece's testimony

regarding migraines as follows:

> Migraines affected [Mr. K.'s] ability to work.  He would get double vision.  He
> had to wear dark glasses when driving.  Sometimes he wore them when he
> worked.  He had to call in sick a few times because of his migraines.
>
> Migraines did not improve when he stopped working.  Botox helped some.
> During a migraine, he would just sit in the dark.  He had migraines 20 days
> a month but not all of them were to the extent that he was unable to function.
> He had ringing in his ears.  He could not focus or concentrate.
>
> When he passed he was in the process of obtaining his master's degree.
> Migraines made this hard.  He used a laptop computer.[74]

The ALJ found Mr. K.'s medically determinable impairments could reasonably be

expected to produce these symptoms, but the "statements concerning the intensity,

persistence and limiting effects of these symptoms [were] not entirely consistent with

the medical evidence and other evidence in the record."[75]

In support of this conclusion, the ALJ referred to records showing Mr. K.'s

migraines were "treated effectively with various treatment modalities including occipital

nerve blocks [], Botox, Cefaly device, sumatriptan, and memantine."[76]  Citing treatment

records from June 2019 (just before the alleged disability onset date) and December

2019 through July 2020, the ALJ noted Mr. K. received occipital nerve blocks

approximately every four weeks and reported "good to adequate response" throughout

---

[73] (*See* Tr. 25, 43–57.)  The ALJ's decision refers to this witness as Mr. K.'s cousin, but she testified she was Mr. K.'s niece.  (*See* Tr. 43.)

[74] (Tr. 25; *see also* Tr. 47–52 (hearing testimony regarding migraines).)

[75] (Tr. 26.)

[76] (Tr. 27.)

the relevant period.[77]  The ALJ acknowledged that in July 2019 (just after the alleged disability onset date), Mr. K. reported "near daily severe headaches with no predictable visual accompaniments, and prominent photophobia and phonophobia."[78]  But he also reported "some benefit from a Cefaly device and with sumatriptan."[79]  On examination, Mr. K. was "in no apparent distress and was alert, fully oriented, and cooperative,"[80] and "[a] brain MRI was negative."[81]  Mr. K. then reported reductions in the frequency and severity of his headaches in August and September 2019 after starting new medication.[82]  The ALJ noted that in February 2020, Mr. K. reported just one migraine every three to four weeks.[83]  Mr. K. also stated the nerve blocks lasted three to four weeks and Botox treatment provided "good relief" for eleven weeks (which the provider described as an "excellent clinical response").[84]  While the ALJ acknowledged Mr. K. reported an increase in headaches in August 2020, he also noted Mr. K. had not received his last Botox injection due to COVID-19 precautions.[85]

---

[77] (*Id.* (citing Tr. 1035, 1172, 1188, 1311, 1853, 1871).)

[78] (*Id.* (citing Tr. 434–35).)

[79] (Tr. 28 (citing Tr. 434).)

[80] (*Id.* (citing Tr. 436).)

[81] (*Id.* (citing Tr. 438).)

[82] (*Id.* (citing Tr. 439, 443).)

[83] (*Id.* (citing Tr. 1064).)

[84] (Tr. 1065.)

[85] (Tr. 28 (citing Tr. 1804).)

The ALJ included restrictions in Mr. K.'s residual functional capacity to account for his migraine symptoms.[86]  For instance, the ALJ restricted Mr. K.'s light and heat exposure because Mr. K. identified bright lights and hot environments as migraine triggers.[87]  The ALJ also restricted Mr. K.'s exposure to hazards and loud noises.[88]  The ALJ found these restrictions, in addition to postural limitations, "reasonably account[ed] for symptoms arising from the claimant's migraines."[89]

Finally, the ALJ considered the prior administrative findings of state agency medical consultants, who opined Mr. K. could perform a full range of exertional work with only postural and environmental limitations due to migraine headaches.[90]  While the ALJ included additional restrictions to account for Mr. K.'s light sensitivity, he found "the postural and environmental restrictions suggested [were] otherwise persuasive and accounted for by the residual functional capacity because they take into account limitations that would reasonably arise from the claimant's migraine headaches."[91]

### 3.  Analysis

Ms. K. argues the ALJ failed to follow SSR 19-4p or "properly use[] Listing 11.02" in evaluating the effects of Mr. K.'s migraines on his residual functional capacity.[92]  She

---

[86] (Tr. 24, 28.)

[87] (*Id.*)

[88] (*Id.*)

[89] (Tr. 28.)

[90] (Tr. 31.)

[91] (*Id.*)

[92] (*See* Opening Br. 12, 14–15, Doc. No. 11.)

further argues "[t]he ALJ's statement that Mr. [K.'s] headaches did not occur more than once a month despite treatment is clearly contradicted by the record."[93]  Finally, Ms. K. argues the ALJ "failed to provide a legal sufficient reason for including no sustainability, sound, or computer time limitations" in the residual functional capacity assessment.[94] These arguments lack merit.

First, the ALJ assessed whether Mr. K.'s migraines medically equaled Listing 11.02 at step three of the sequential evaluation, as required under SSR 19-4p.[95] Contrary to Ms. K.'s assertion, the ALJ expressly cited SSR 19-4p in this analysis.[96] But regardless, Ms. K. does not challenge the ALJ's step-three finding that Mr. K.'s

---

[93] (*Id.* at 15.)

[94] (*Id.*)

[95] (Tr. 24.)  Although Ms. K. does not raise this issue, the ALJ cited paragraphs A, B, C, and D of Listing 11.02, even though only paragraphs B and D apply when evaluating migraines.  (*See* SSR 19-4p, 2019 SSR LEXIS 6, at *16.)  The ALJ also applied the frequency requirements from the inapplicable paragraphs A ("once a month for at least 3 consecutive months") and C ("once every 2 months for at least 4 consecutive months").  (*See* Tr. 24); 20 C.F.R. pt. 404, subpt. P, App. 1, § 11.02(A), (C).  But paragraphs B and D require even more frequent migraines ("once a week for at least 3 consecutive months" under paragraph B, and "once every 2 weeks for at least 3 consecutive months" under paragraph D).  20 C.F.R. pt. 404, subpt. P, App. 1, § 11.02(B), (D).  In other words, the ALJ's finding that Mr. K. did not meet the frequency requirements of paragraphs A and C necessarily means he did not meet the more stringent requirements of paragraphs B and D.  Accordingly, the ALJ's erroneous inclusion of paragraphs A and C in his analysis was harmless.

[96] (*See* Tr. 24; Reply 7, Doc. No. 19 (erroneously asserting the ALJ's decision "does not even mention SSR 19-4p").)

migraines did not medically equal a listing.[97]  Instead, she argues the ALJ failed to

follow SSR 19-4p or "use" Listing 11.02 in his residual functional capacity assessment.[98]

        This argument fails.  The portion of SSR 19-4p addressing residual functional

capacity merely reiterates the standards for evaluating a claimant's symptoms and

resulting limitations—it does not refer to Listing 11.02 nor describe any special

considerations or procedures.[99]  Ms. K. does not explain (nor is it apparent) why an ALJ

would be required to "use" Listing 11.02 at this step of the sequential analysis.  As

described above, the ALJ followed the standard two-step process for evaluating Mr. K.'s

reported symptoms and limitations related to migraines, including considering whether

---

[97] (*See* Reply 4, Doc. No. 19 (confirming Mr. K. is not challenging this issue).)

[98] (Opening Br. 15, Doc. No. 11.)

[99] *See* SSR 19-4p, 2019 SSR LEXIS 6, at *18–19.  Under the heading "How do we
consider a[] [medically determinable impairment] of a primary headache disorder in
assessing a person's residual functional capacity?", SSR 19-4p states as follows:

> If a person's primary headache disorder, alone or in combination with
> another impairment(s), does not medically equal a listing at step three of
> the sequential evaluation process, we assess the person's residual
> functional capacity (RFC).  We must consider and discuss the limiting
> effects of all impairments and any related symptoms when assessing a
> person's RFC.  The RFC is the most a person can do despite his or her
> limitation(s).
>
> We consider the extent to which the person's impairment-related symptoms
> are consistent with the evidence in the record.  For example, symptoms of
> a primary headache disorder, such as photophobia, may cause a person to
> have difficulty sustaining attention and concentration.  Consistency and
> supportability between reported symptoms and objective medical evidence
> is key in assessing the RFC.

*Id.* at *18–19.  This is merely a restatement of the standards governing the residual
functional capacity evaluation, which are expressly referenced in this section of the
SSR.  *See id.* at *18 n.26 (citing 20 C.F.R. §§ 404.1545, 416.945 (regulations
addressing residual functional capacity)).

they were consistent with the medical evidence.  And the ALJ considered all the evidence related to migraines in assessing their effect on Mr. K.'s residual functional capacity, including his self-reported symptoms, his niece's testimony, his treatment records, and medical opinion evidence.  In other words, the ALJ properly applied the legal standards for assessing residual functional capacity.  Nothing more is required under SSR 19-4p.

Next, substantial evidence supports the ALJ's finding regarding the frequency of Mr. K.'s migraines.  As an initial matter, Ms. K. mischaracterizes the ALJ's finding.  She claims the ALJ found "Mr. [K.'s] headaches did not occur more than once a month despite treatment."[100]  The ALJ actually stated: "The record failed to demonstrate a *documented typical migraine pattern* occurring more frequently than once a month, in spite of at least three months of prescribed treatment as required by 11.02A and 11.02B."[101]  Importantly, this statement was made in the context of evaluating whether Mr. K.'s migraines medically equaled a listing at step three.  As the Commissioner points out, a finding of medical equivalence at step three requires supportive evidence from a medical or psychological consultant, a medical expert, or the Appeals Council's

---

[100] (Opening Br. 15, Doc. No. 11.)

[101] (Tr. 24 (emphasis added).)  As noted above (*supra* note 95), the "once a month" frequency standard the ALJ referenced comes from paragraph A of Listing 11.02, which is inapplicable to migraines.  *See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 11.02(A); SSR 19-4p, 2019 SSR LEXIS 6, at *16.  But paragraphs B and D (the applicable paragraphs) require even more frequent migraines.  *See* 20 C.F.R. pt. 404, subpt. P, App. 1, § 11.02(B), (D).  The ALJ's finding that Mr. K. did not meet the frequency requirement of paragraph A necessarily means he did not meet the more stringent requirements of paragraphs B and D.

medical support staff.[102]  Ms. K. does not dispute that the record in this case contains no such evidence—nor does she dispute the ALJ's conclusion that Mr. K.'s migraines did not medically equal a listing.[103]  Understood in this context, the ALJ's statement accurately describes the record, which contains no medical expert finding that Mr. K. had a "documented typical migraine pattern" at the required frequency to medically equal a listing.

Finally, Ms. K. fails to demonstrate error relating to the ALJ's findings on sustainability, sound, or computer time limitations.  Ms. K. asserts the residual functional capacity assessment lacked sound limitations, but this is simply incorrect.  The ALJ expressly restricted Mr. K. from exposure to loud noises due to his migraines.[104]  As to computer time, the ALJ included a restriction on exposure to bright lights.[105]  Moreover, as the ALJ noted, Mr. K.'s niece testified Mr. K. could use a laptop at least for short periods during his graduate studies.[106]  Meanwhile, Ms. K. identifies no medical opinion testimony endorsing computer time restrictions and she fails to explain what additional, specific restrictions regarding computer time should have been included.  Under these circumstances, the ALJ did not err in omitting computer time restrictions from the residual functional capacity.

---

[102] *See* SSR 17-2p, 2017 SSR LEXIS 2, at *7 (Mar. 27, 2017).

[103] (*See* Answer Br. 11–12, Doc. No. 17; Reply 4, Doc. No. 19.)

[104] (Tr. 24, 28.)

[105] (*Id.*)

[106] (*See* Tr. 25, 51–52.)

As to sustainability, Ms. K. argues the evidence shows Mr. K. could not sustain a work schedule due to the frequency and severity of his migraines.[107]  But the ALJ found Mr. K.'s (and his niece's) statements regarding the "intensity, persistence and limiting effects" of his symptoms not entirely consistent with the evidence.[108]  As described above, the ALJ found Mr. K.'s migraines were treated effectively, citing treatment records indicating a "good to adequate response" throughout the relevant period.[109]  The ALJ also relied on prior administrative findings indicating Mr. K.'s migraines required only certain postural and environmental limitations, which the ALJ included in the residual functional capacity assessment.[110]  The medical records and administrative findings cited by the ALJ constitute substantial evidence ("more than a mere scintilla"[111]) supporting the finding that Mr. K.'s migraines were not as limiting as he claimed, and were adequately addressed by the restrictions included in the residual functional capacity assessment.

In sum, the ALJ applied the correct legal standards in evaluating Mr. K.'s migraines, and his residual functional capacity findings are supported by substantial evidence.  Accordingly, Mr. K. has demonstrated no error in the ALJ's assessment of his migraines.

---

[107] (Opening Br. 15, Doc. No. 11.)

[108] (Tr. 26.)

[109] (Tr. 27 (citing Tr. 1035, 1172, 1188, 1311, 1853, 1871).)

[110] (Tr. 31.)

[111] *Biestek*, 587 U.S. at 103.

**CONCLUSION**

The Commissioner's decision is affirmed.

DATED this 28th day of February, 2025.

BY THE COURT:

_Daphne A. Oberg_
Daphne A. Oberg
United States Magistrate Judge